Sparrow Sys., Inc. v. Private Diagnostic Clinic, PLLC, 2014 NCBC 69.

| | |
|---|---|
| STATE OF NORTH CAROLINA<br><br>MECKLENBURG COUNTY<br><br>SPARROW SYSTEMS, INC.,<br><br>            Plaintiff,<br><br>v.<br><br>PRIVATE DIAGNOSTIC CLINIC, PLLC,<br><br>            Defendant. | IN THE GENERAL COURT OF JUSTICE<br>SUPERIOR COURT DIVISION<br>14 CVS 1025<br><br><br><br>**ORDER AND OPINION** |

{1}    **THIS MATTER** is before the Court upon Defendant's Motion to Dismiss and for Attorneys' Fees (hereinafter demarcated as "Motion to Dismiss" and "Motion for Attorneys' Fees") in the above-captioned case.

{2}    The Court, having considered the Motions, affidavits and supporting briefs, as well as the arguments of counsel at the September 19, 2014 hearing in this matter, hereby **GRANTS** in part and **DENIES** in part Defendant's Motion to Dismiss and **DENIES** Defendant's Motion for Attorneys' Fees.

*Cooper & Kirk, PLLC, by Nicole Jo Moss, and McAngus, Goudelock & Courie, PLLC, by John T. Jeffries and Jeffrey B. Kuykendal, for Plaintiff Sparrow Systems, Inc.*

*Moore & Van Allen, PLLC, by John A. Zaloom and Drew K. Kifner, for Defendant Private Diagnostic Clinic, PLLC.*

Bledsoe, Judge.

## I.
## BACKGROUND

{3}     The Court recites herein the allegations set forth in Plaintiff's Complaint that are relevant for purposes of resolving the present Motions.[1]

{4}     Plaintiff is a North Carolina corporation with its principal place of business in Charlotte.  (Compl. ¶ 14.)

{5}     Diana Clontz founded Plaintiff in 1998 in order "to develop and market medical records software."  (*Id.* ¶ 16.)

{6}     Plaintiff's primary software product, known as "Sparrow Systems," is comprised of three components: "(1) carefully constructed patient intake forms; (2) a document scanning and text recognition platform; and (3) a database designed by [Plaintiff]."  (*Id.*)

{7}     Defendant, Duke University Medical Center's Private Diagnostic Clinic, PLLC (hereinafter, "Defendant" or "Duke"), maintains its principal place of business at Duke University Medical Center ("DUMC") in Durham.  (*Id.* ¶ 15.) Defendant's members both practice medicine at DUMC and serve as faculty at Duke University School of Medicine.  (*Id.*)

{8}     Plaintiff attracted its largest client – Defendant – in late 1999, when Defendant contacted Plaintiff to request a free trial of Sparrow Systems.  (*Id.* ¶ 20.)

---

[1] The Court does not make findings of fact in ruling on motions to dismiss, "as such motions do 'not present the merits, but only [determine] whether the merits may be reached.'" *Out of the Box Developers, LLC v. LogicBit Corp.*, 2012 NCBC 53 ¶9 (N.C. Super. Ct., Oct. 30, 2012), http://www.ncbusinesscourt.net/opinions/2012_NCBC_53.pdf (quoting *Concrete Serv. Corp. v. Investors Grp., Inc.*, 79 N.C. App. 678, 681, 340 S.E.2d 755, 758 (1986)).

{9} The six-month trial period was a success, and Defendant thereafter informed Plaintiff of its decision to implement Sparrow Systems for continued use by members of its Orthopedics group ("Orthopedics"). (*Id.* ¶ 21.)

{10} Plaintiff accordingly sent its standard licensing contract ("the Contract") to Defendant to consummate the agreement. Specifically, Plaintiff transmitted the Contract via email to Roman Perun, an information technology employee of Defendant assigned to implement Sparrow Systems. (*Id.*)

{11} At Defendant's request, Plaintiff began setting up Sparrow Systems for use by several of Defendant's orthopedic surgeons. (*Id.*)

{12} Defendant's six-month free trial period of Sparrow Systems had extended to twenty months by the time Mr. Perun provided Plaintiff with Defendant's revised version of the Contract on August 15, 2002. (*Id.*)

{13} Ms. Clontz immediately signed the Contract in her capacity as Plaintiff's President and returned it to Mr. Perun, indicating that she had accepted all of Defendant's revisions. (*Id.* ¶ 22.) Mr. Perun responded that he would forward the Contract to the appropriate persons at Duke. (*Id.* ¶ 23.)

{14} Plaintiff never received an executed copy of the Contract signed by Defendant. (*Id.* ¶ 26.)

{15} Notwithstanding the absence of a signed agreement, Defendant and Plaintiff began performing consistent with the terms of the Contract. Defendant paid Plaintiff licensing fees, as provided for under the Contract, of $500 per month for each medical provider that was using Sparrow Systems, and Plaintiff provided technical

support and software updates to Sparrow Systems, as was also provided for under the Contract. (*Id.* ¶¶ 24—26.)

{16}  In January 2004, Ms. Clontz met with several individuals from Defendant's Urology group ("Urology") to discuss Urology's possible implementation and use of Sparrow Systems. (*Id.* ¶ 32.) Prior to the meeting, Ms. Clontz was asked to demonstrate Sparrow Systems to Dr. Leon Sun, a database developer working with Urology, and to download some of Plaintiff's proprietary forms onto Dr. Sun's computer. (*Id.*) Ms. Clontz was reluctant to share Plaintiff's intellectual property, but agreed to do so based on Urology's representations that it was serious about licensing Sparrow Systems and based on her belief that Plaintiff's intellectual property was protected by the Contract, which expressly prohibited Defendant from, *inter alia*, appropriating, adapting, copying, or reverse engineering Sparrow Systems. (*Id.* ¶ 34, Ex. A, p. 1.)

{17}  Following the meeting, Urology indicated that it was "impressed" with Sparrow Systems, but did not want to pay for it. (*Id.* ¶ 35.)

{18}  Ms. Clontz, having revealed Plaintiff's proprietary information to Dr. Sun and Urology, articulated to two of Defendant's physicians, Dr. James Nunley and Dr. Williamson Richardson, her concern that Defendant might attempt to appropriate, adapt, copy, or reverse engineer Sparrow Systems in contravention of Defendant's promises under the Contract. (*Id.* ¶ 36.) Dr. Richardson assured Ms. Clontz that Defendant would adhere to the terms of the Contract; however, he also warned Ms. Clontz against "rocking the boat," asserting that Defendant would be able to

"outlawyer" Plaintiff should any dispute arise between them. (*Id.*) Ms. Clontz declined to press the matter further for fear of jeopardizing Plaintiff's relationship with its largest client. (*Id.*)

{19} At or about this time, Dr. Richardson requested that Plaintiff exempt Defendant's general practitioners from the $500 monthly fee described under the Contract. (*Id.* ¶ 46.) Plaintiff acquiesced only after Dr. Richardson allegedly threatened to terminate Defendant's contract with Plaintiff if Plaintiff did not accept this condition. (*Id.*)

{20} Several years later, in 2008, Dr. Richardson requested that Plaintiff provide Defendant with Plaintiff's "data dictionary" – which Plaintiff describes as "essentially a road map to Sparrow Systems" and "one of the keys to [Plaintiff's] intellectual property and proprietary information" – for purposes of performing a "quality control" test on Sparrow Systems. (*Id.* ¶ 40.) Dr. Richardson allegedly threatened again to cancel Defendant's contract with Plaintiff if Plaintiff did not comply. (*Id.*) Plaintiff, seeking to maintain its relationship with Defendant and believing that the Contract would protect its intellectual property, provided its data dictionary to Defendant as requested. (*Id.*)

{21} In 2012, Dr. Richardson notified Plaintiff that Defendant again needed to perform a "quality control" check on Sparrow Systems. (*Id.* ¶ 41.) This time, Dr. Richardson directed Plaintiff to install Sparrow Systems on the computer of Dr. Robin Queen, a researcher at Duke, and also demanded that Plaintiff disclose to Defendant additional proprietary information, such as Plaintiff's scoring calculations for various

patient outcome instruments. (*Id.*) Plaintiff complied with Dr. Richardson's demands because Plaintiff was "eager to prove its product's worth" and because, again, Plaintiff believed that its intellectual property was adequately protected by the Contract. (*Id.*)

{22} In late 2012, Plaintiff discovered that a Duke employee "had been sitting at the Sparrow Systems workstation in Orthopedics to 'learn' Sparrow Systems so that she [could] figure out how to perform the same functions on Urology's database." (*Id.* ¶ 37.) Ms. Clontz investigated and was able to ascertain that Urology had built a database that was "strikingly similar" to Sparrow Systems; she noted that Urology's database even employed the same unique Teleform software that Ms. Clontz had demonstrated to Dr. Sun years earlier. (*Id.* ¶ 38.)

{23} Plaintiff also discovered, around this time, that Defendant had failed to notify Plaintiff of – and thus had neglected to pay for – all of Defendant's physicians, other medical providers, and support staff (collectively, "medical providers") that were using or had used Sparrow Systems. (*Id.* ¶ 46.) Plaintiff contends that Defendant's failure to notify Plaintiff of all new medical providers' use of Sparrow Systems violated the Contract's requirement that Defendant "provide [Plaintiff] with (30) days advance written notice" if Defendant's "number of [medical] Providers increases." (*Id.* Ex. A, p. 8.)

{24} In January 2013, Dr. Richardson informed Ms. Clontz that Dr. Queen – the researcher on whose computer Plaintiff had installed Sparrow Systems just months earlier – was in the process of creating a new medical records system for Defendant that would replace Sparrow Systems. (*Id.* ¶ 43.) When Ms. Clontz reminded Dr.

Richardson of the Contract's prohibition against Defendant's appropriating, copying, adapting, or reverse engineering Plaintiff's intellectual property, Dr. Richardson allegedly responded that Plaintiff's data was not proprietary and that, even if Defendant was attempting to appropriate Plaintiff's intellectual property, Defendant's "pockets were much deeper than" Plaintiff's and Defendant would be able to "outlawyer" Plaintiff if Plaintiff sought to enforce the Contract. (*Id.* ¶ 44.)

{25} A couple of months later, in March 2013, Defendant provided Plaintiff with written notice that it sought to terminate its use of Sparrow Systems. (*Id.* ¶ 48.) Plaintiff refused to accept Defendant's purported notice of cancellation, however, citing a provision in the Contract that required Defendant to tender written notice of cancellation ninety (90) days prior to expiration of the then-current contractual period, which ended March 30, 2013. Thus, because Defendant had failed to provide ninety (90) days advance written notice – i.e., by January 1, 2013 – Plaintiff advised Defendant that the Contract, by its terms, automatically renewed for an additional one-year period. (*Id.* ¶ 49.) Defendant has refused to pay, and contends that it is not obligated to pay, Plaintiff for its use of Sparrow Systems for the April 1, 2013 – March 30, 2014 period. (*Id.*)

{26} Plaintiff filed its Complaint in this action on January 16, 2014, asserting claims against Defendant for breach of contract, breach of implied contract, malicious breach of contract, breach of the covenant of good faith and fair dealing, fraud, quantum meruit or unjust enrichment, unfair and deceptive trade practices, and punitive damages.

{27} This action was subsequently designated a mandatory complex business case and assigned to this Court (Murphy, J.) on February 26, 2014. The case was reassigned to the undersigned on July 2, 2014.

{28} Defendant filed its Motion to Dismiss on March 31, 2014, contending that many of Plaintiff's claims are subject to dismissal under Rule 12(b)(1) and/or Rule 12(b)(6) of the North Carolina Rules of Civil Procedure. Defendant also filed a Motion for Attorneys' Fees, requesting an award of its costs, including attorneys' fees, incurred in defending against Plaintiff's claims in this action.

{29} Following a continuance requested by the parties, the Court held a hearing on Defendant's Motion to Dismiss and Defendant's Motion for Attorneys' Fees on September 19, 2014.

II.
ANALYSIS

A.
Defendant's Motion to Dismiss

{30} Defendant seeks dismissal of Plaintiff's claims on grounds that they (i) are preempted by the federal Copyright Act and therefore are subject to dismissal under Rule 12(b)(1) for lack of subject matter jurisdiction; (ii) are time-barred by the applicable statutes of limitations and therefore are subject to dismissal under Rule 12(b)(6); and/or (iii) are also subject to dismissal under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

<u>Legal Standard</u>

{31}   A motion to dismiss pursuant to Rule 12(b)(1) of the North Carolina Rules of Civil Procedure represents a challenge to the trial court's subject matter jurisdiction over the plaintiff's claims.   N.C.G.S. § 1A-1, Rule 12(b)(1) (2014). "Subject-matter jurisdiction . . . refers to a tribunal's 'power to hear a case[.]'" *Union Pac. R.R. v. Bhd. of Locomotive Eng'rs & Trainmen Gen. Comm. of Adjustment*, 558 U.S. 67, 81 (2009) (citations omitted).  The question of whether a plaintiff's state law claims are preempted by federal law implicates the trial court's subject matter jurisdiction.  *Venable v. GKN Automotive*, 107 N.C. App. 579, 583, 421 S.E.2d 378, 381 (1992).  Moreover, in addressing Rule "12(b)(1) motions that attack the complaint on its face . . .  the court [must] consider the allegations of the complaint as true." *Mortensen v. First Federal Savings & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977).

{32}   The question for the Court on a Rule 12(b)(6) motion to dismiss is "whether, as a matter of law, the allegations of the complaint, treated as true, are sufficient to state a claim upon which relief may be granted under some legal theory, whether properly labeled or not." *Harris v. NCNB Nat'l Bank of North Carolina*, 85 N.C. App. 669, 670, 355 S.E.2d 838, 840 (1987).  "The complaint must be liberally construed, and the court should not dismiss the complaint unless it appears beyond a doubt that the plaintiff could not prove any set of facts to support his claim which would entitle him to relief." *Block v. County of Person*, 141 N.C. App. 273, 277–78, 540 S.E.2d 415, 419 (2000) (quoting *Harris*, 85 N.C. App. at 670, 355 S.E.2d at 840).  When the complaint fails to allege the substantive elements of some legally cognizable claim, or where it alleges facts that defeat the claim, the complaint should be dismissed under

Rule 12(b)(6). *Hudson-Cole Dev. Corp. v. Beemer*, 132 N.C. App. 341, 345–46, 511 S.E.2d 309, 312 (1999).

Preemption

{33}  Defendant contends that many of Plaintiff's claims are within the scope of the federal Copyright Act, 17 U.S.C. §§ 101 *et seq.*, and should accordingly be dismissed on preemption grounds.  More specifically, Defendant contends that Plaintiff's claims for breach of contract, breach of implied contract, malicious breach of contract, quantum meruit or unjust enrichment, and unfair and deceptive trade practices "primarily consist[] of variations on an allegation that [Defendant] copied, adapted, or reverse engineered [Plaintiff's] intellectual property, or that [Defendant] distributed copies of [Plaintiff's] intellectual property to unauthorized doctors without paying [Plaintiff's] licensing fees . . . such that [Plaintiff's] exclusive remedy is for copyright infringement, for which subject matter jurisdiction is exclusively in federal court." (Def.'s Br. Supp. Mot. to Dismiss, p. 5.)

{34}  Section 301(a) of the Copyright Act provides, in pertinent part, as follows:

> [A]ll legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103 . . . are governed exclusively by [the Copyright Act].

17 U.S.C. § 301(a) (2014).

{35}  Section 106 of the Copyright Act provides, in pertinent part, that "the owner of copyright . . . has the exclusive rights to . . . [1] reproduce the copyrighted work in copies or phonorecords[;] . . . [2] prepare derivative works based upon the copyrighted work; [and 3] . . . distribute copies or phonorecords

of the copyrighted work to the public by sale or other transfer of ownership . . . ." 17 U.S.C. § 106(1)-(3) (2014).

{36} "Stated as a broad general rule, a state law cause of action is preempted by the Copyright Act if: (1) the cause of action falls within the subject matter of copyright law; and (2) the rights protected by state law are equivalent to any of the exclusive rights granted by the Copyright Act." *LogicBit*, 2012 NCBC 53 at ¶ 38 (citing *Rosciszewski v. Arete Assocs., Inc.*, 1 F.3d 225, 229 (4th Cir. 1993)).

{37} Plaintiff's cause of action in the instant case "falls within the subject matter of copyright law" because Plaintiff's claims center upon Defendant's alleged misappropriation of Sparrow Systems, an original work of authorship fixed in a tangible medium. 17 U.S.C. §§ 102—103 (2014); *see LogicBit*, 2012 NCBC 53 at ¶ 38.

{38} With respect to whether the rights that Plaintiff seeks to protect through its assertion of state law claims in this action "are equivalent to any of the exclusive rights granted by the Copyright Act," our courts have previously drawn upon the Fourth Circuit's articulation of the "extra element" test as follows:

> In order to ascertain whether a specific state cause of action involves a right equivalent to one of those identified in § 106, reference must be made to the elements of the state cause of action. State-law claims that infringe one of the exclusive rights contained in § 106 are preempted by § 301(a) if the right defined by state law "may be abridged by an act which, in and of itself, would infringe one of the exclusive rights." However, "if an 'extra element' is 'required instead of or in addition to the acts of reproduction, performance, distribution or display, in order to constitute a state-created cause of action, . . . there is no preemption,'" provided that "the 'extra element' changes the 'nature of the action so that it is *qualitatively* different from a copyright infringement claim[.]'"

*LogicBit*, 2012 NCBC 53 at ¶ 38 (quoting *Rosciszewski*, 1 F.3d at 229—30

(citations omitted) (alterations and emphasis in original).

{39} Bearing the foregoing principles in mind, the Court will now examine the claims at issue to determine whether each claim will require proof of an "extra element" such that the claim is substantively distinguishable, or "qualitatively different," from a claim for copyright infringement, which simply requires proof of "(1) ownership of a valid copyright; and (2) copying of constituent elements of the work that are original." *Id.* at ¶ 42 (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 361 (1991)).

### i. Breach of Contract

{40} Plaintiff alleges that Defendant has breached the Contract in "three distinct ways." (Compl. ¶ 56.) Defendant contends that each of these claimed breaches is subject to dismissal on preemption grounds.

### Alleged Breach #1

{41} First, Plaintiff alleges that Defendant breached the Contract by failing to pay Plaintiff for its use of Sparrow Systems during the April 1, 2013 – March 30, 2014 period. This claim is not preempted, as success on the merits will require proof of an "extra element" – namely, proof of nonpayment of the amount that Defendant promised to Plaintiff under the terms of the Contract for the time period in question. *See, e.g., Madison River Mgmt. Co. v. Bus. Mgmt. Software Corp.*, 387 F. Supp. 2d 521, 541 (M.D.N.C. 2005) (holding that plaintiff's claim for excessive use of its software was "more appropriately a breach of contract claim than a copyright infringement claim because [plaintiff's software agreement with defendant] contained an express promise to pay for excess use" and that "this express promise to

pay create[d] an extra element which prevent[ed] preemption by the Copyright Act")) (citing *Acorn Structures, Inc. v. Swantz*, 846 F.2d 923, 926 (4th Cir. 1988), where the "plaintiff's breach of contract claim was not preempted because the corresponding promise to pay for *any* use by the defendant constituted an extra element" (emphasis in original)).[2]  Accordingly, the Court finds that the requisite showing of nonpayment here will entail proof "in addition to [proof of] the acts of reproduction, performance, distribution or display" and renders this claimed breach of the Contract qualitatively different from a claim for copyright infringement.  *LogicBit*, 2012 NCBC 53 at ¶ 38.

### Alleged Breach #2

{42}  Second, Plaintiff alleges that Defendant breached the Contract by failing to pay the requisite $500 monthly licensing fee for some of its medical providers that were using Sparrow Systems.

{43}  Like the first alleged breach discussed above, Plaintiff's second claimed breach of the Contract will also require proof of nonpayment of amounts purportedly owed by Defendant under the Contract.  Specifically, Defendant promised pursuant to paragraph 5.1 ("Payment Terms") and Exhibit B to the Contract that it would notify Plaintiff of any new medical providers using Sparrow Systems, within thirty

---

[2] Judge Gale has previously observed that "[s]ome circuits have held that the existence of a contractual promise in and of itself constitutes an extra element sufficient to avoid preemption," *LogicBit*, 2012 NCBC at ¶ 40 (citing *ProCD, Inc. v. Zeidenburg*, 86 F.3d 1447, 1454 (7th Cir. 1996), while "[s]ome decisions within the Fourth Circuit found that the asserted breach of contract claims [were] preempted," *Out of the Box Developers, LLC*, 2012 NCBC at ¶ 40 (citing *The Nichols Agency, Inc. v. Enchanted Child Care, Inc.*, 537 F. Supp. 2d 774 (D. Md. 2008); *Madison River Mgt. Co.*, 351 F. Supp. 2d 436, 443—44 (M.D.N.C. 2005); *Brown v. McCormick*, 23 F. Supp. 2d 594, 608 (D. Md. 1998); and *Wharton v. Columbia Pictures Indus., Inc.*, 907 F. Supp. 144, 146 (D. Md. 1995)).  The Court need not decide between these apparently conflicting authorities here, however, as Plaintiff has alleged more than a mere breach of a promise not to copy its intellectual property.

(30) days of commencement of such use, in order to trigger Defendant's obligation to pay Plaintiff the $500 monthly licensing fee with respect to each new medical provider. Thus, applying the reasoning of *Madison River* and *Acorn Structures*, *supra*, the Court concludes that Plaintiff's second claimed breach of the Contract will also require proof an "extra element" – nonpayment – and therefore is not preempted by the Copyright Act.

### Alleged Breach #3

{44} Third, Plaintiff alleges that Defendant breached the Contract "by adapting and reverse engineering Sparrow Systems' database and forms" and requests compensation for Plaintiff's "lost revenue resulting from [Defendant's] unauthorized adaptation and reverse engineering of Sparrow Systems." (Compl. ¶ 57.)

{45} Section 2.2 of the Contract, entitled "License and Use Restrictions," provides, in pertinent part, as follows:

> [Defendant] agrees that, without [Plaintiff's] prior written consent, [Plaintiff's] Software shall not be . . . translated, decompiled or disassembled by reverse engineering or otherwise adapted in any way."

(*Id.* Ex. A, p. 1.) [3]

{46} Plaintiff's inclusion of this provision in the Contract was not merely a reassertion of its rights under the Copyright Act, as "[r]everse engineering is not within the scope of the exclusive rights of copyright." *Meridian Project Sys. v. Hardin*

---

[3] "Reverse engineering" is not a defined term in the Contract, but the Federal Circuit has observed that it means "to study or analyze (a device, as a microchip for computers) in order to learn details of design, construction, and operation, perhaps to produce a copy or an improved version." *Bowers v. Baystate Techs., Inc.*, 320 F.3d 1317, 1326 (Fed. Cir. 2003) (citations omitted).

*Constr. Co., LLC,* 426 F. Supp. 2d 1101, 1109 (E.D. Cal. 2006) (citing 17 U.S.C. § 106). It is thus not the case that the Contract "imposes no obligations other than those created by the [copyright] law itself." *Tart v. Walker*, 38 N.C. App. 500, 503—04, 248 S.E.2d 736, 738 (1978) (breach of contract claim preempted on grounds that the contact at issue "in no way expand[ed] upon the obligations created by the patent law"). To the contrary, by agreeing to this provision, Defendant promised to "contractually forego [its] limited ability to reverse engineer a software product under the exemptions of the Copyright Act." *Bowers*, 320 F.3d at 1326; *see also Davidson & Assoc. v. Jung*, 422 F.3d 630, 636, 639 (8th Cir. 2005) (finding no preemption where defendants "expressly relinquished their rights to reverse engineer" plaintiff's software by entering into the contract at issue and plaintiff alleged that defendants had breached the contract by "us[ing] reverse engineering to learn" plaintiff's software).

{47} Moreover, Plaintiff's allegations with respect to this particular claimed breach of the Contract describe Defendant's reverse engineering, not mere copying, of Sparrow Systems. Plaintiff alleges, for instance, that Defendant used the proprietary information that it was able to gather through Plaintiff's disclosures – first in 2004, when Plaintiff installed its software on Dr. Sun's computer; next in 2008, when Defendant obtained Plaintiff's "data dictionary" to perform "quality control testing"; and finally in 2012, when Plaintiff installed additional proprietary information on Dr. Queen's computer – for the purpose of understanding Sparrow Systems in sufficient detail to create, in-house, its own software system. Indeed,

Plaintiff further alleges that Defendant specifically assigned a Duke employee to study and "learn" Sparrow Systems and that Dr. Queen, who acquired personal access to Plaintiff's proprietary information in 2012, was largely responsible for developing "Epic," the software that ultimately replaced Sparrow Systems the following year. (Compl. ¶¶ 32, 37, 40.) Accordingly, based on Plaintiff's allegations in support of its claim for breach by reverse engineering, the Court concludes that Plaintiff's claim seeks protection of contractual rights that are not exclusively within, and therefore not preempted by, the Copyright Act. *See, e.g., Forest2Market, Inc. v. Am. Forest Mgmt.*, 2008 U.S. Dist. LEXIS 33185, 5—6, 14—15 (W.D.N.C., Apr. 21, 2008) (upholding conclusion that plaintiff's breach of contract claim, which arose out of defendant's alleged breach of license agreement prohibiting, *inter alia*, reverse engineering and adaptation of information and services on plaintiff's website, "contain[ed] an extra element worthy of removal from preemption" where plaintiff alleged that defendants had "used deception to gain access to the information and services provided [on plaintiff's website] in order to form their own competing business") (citing *Acorn Structures*, 846 F.2d 923; *Bowers*, 320 F.3d 1317; and *Davidson*, 422 F.3d 630, among other authorities); *Meridian Project Sys.*, 426 F. Supp. 2d at 1108—09 (holding that to the extent the parties' contract prohibited reverse engineering, plaintiff's breach of contract claim was not preempted because the contract protected rights qualitatively different from those protected by Copyright Act); *see also Altera Corp. v. Clear Logic, Inc.*, 424 F.3d 1079, 1089 (9th Cir. 2005) (noting that "[m]ost courts have held that the Copyright Act does *not* preempt

the enforcement of contractual rights" (emphasis in original)).

## ii. Breach of Implied Contract

{48} Seeking to cover its bases in the event the Court finds that no express contract existed between the parties, Plaintiff alleges that "the actions of the parties make clear that there was at least an implied contract between [Defendant] and [Plaintiff]." (Compl. ¶ 62.) Defendant contends that Plaintiff's breach of implied contract claim should be dismissed on preemption grounds for the "same reasons" Plaintiff's (express) breach of contract claim should be dismissed on preemption grounds. (Def.'s Br. Supp. Mot. to Dismiss, p. 10.)

{49} Preliminarily, the Court notes for clarification purposes that Plaintiff's breach of implied contract claim appears to assert a claim for breach of contract "implied in fact," as opposed to a claim for breach of contract "implied in law." "[A] contract implied in fact arises where the intent of the parties is not expressed, but an agreement in fact, creating an obligation, is implied or presumed from their acts." *Creech v. Melnik*, 347 N.C. 520, 526, 495 S.E.2d 907, 911 (1998). "Such an implied contract is as valid and enforceable as an express contract," and "[e]xcept for the method of proving the fact of mutual assent, there is no difference in the legal effect of express contracts and contracts implied in fact." *Id.* at 526—27, 495 S.E.2d at 911. In contrast, a contract implied *in law* – or "quasi contract" – can arise only where there is no actual agreement between the parties, and the court instead "implies" a contract to permit recovery in "quantum meruit" "'for the reasonable value of services rendered in order to prevent unjust enrichment.'" *Paul L. Whitfield, P.A. v. Gilchrist*, 348 N.C. 39, 42, 497 S.E.2d 412, 414—15 (1998) (quoting *Potter v. Homestead*

*Preservation Ass'n*, 330 N.C. 569, 578, 412 S.E.2d 1, 7 (1992)).

{50}  Plaintiff's breach of implied contract claim alleges breach of a contract implied in fact, as it asserts the existence of a contract based upon the parties' apparent adherence to the terms of the Contract over the course of approximately a decade.  This characterization is supported by the fact that Plaintiff does not seek quantum meruit recovery in respect of this claim, but rather has asserted a separate claim for unjust enrichment, as discussed further *infra*.  Thus, because an implied contract in fact, as alleged here, is substantively equivalent to an express contract in that there exists in both instances a valid and binding contract governing the parties' agreement, *see* 1-1 Corbin on Contracts § 1.20 (providing that "[a] contract 'implied in fact' is a true contract that arises from the tacit agreement of the parties") and *Creech*, 347 N.C. at 526—27, 495 S.E.2d at 911, the Court concludes, for the reasons stated above in connection with Plaintiff's breach of (express) contract claim, that Plaintiff's claimed breaches of an agreement between the parties – whether couched as a claim for breach of express contract or as a claim for breach of implied contract – are not preempted by the Copyright Act.  *See Forest Park Pictures v. Universal TV Network, Inc.*, 683 F.3d 424, 432 (2d Cir. 2012) ("As long as the elements of a contract are properly pleaded, there is no difference for preemption purposes between an express contract and an implied-in-fact contract.").[4]

---

[4] Defendant asserted at the hearing that Plaintiff cannot state a valid claim for breach of both an express contract and an implied contract at the same time – i.e., the existence of one precludes the existence of the other.  Defendant is correct that "[t]here cannot be an express and an implied contract for the same thing existing at the same time," *Ron Medlin Constr. v. Harris*, 199 N.C. App. 491, 495, 681 S.E.2d 807, 810 (2009) (citations and quotation marks omitted), and, accordingly, that a claimant cannot recover on both claims, *Keith v. Day*, 81 N.C. App. 185, 199, 343 S.E. 2d 562, 571 (1986).  It is

### iii. Malicious Breach of Contract

{51}   "Malicious breach of contract" is not a recognized cause of action in North Carolina.  Accordingly, the Court DISMISSES this claim with prejudice.[5]

### iv. Quantum Meruit/Unjust Enrichment

{52}   Plaintiff alleges that "[i]f the Court determines that [Defendant] is not bound by [the Contract], then [Defendant] is subject to a claim for quantum meruit" because Plaintiff "provided a valuable and significant economic benefit to [Defendant] by licensing [Sparrow Systems]." (Compl. ¶ 84.)  Defendant contends that Plaintiff's unjust enrichment claim is preempted "for the same reasons [Plaintiff's] claims for breach of contract are [preempted]." (Def.'s Br. Supp. Mot. to Dismiss, p. 11.)

{53}   "Under North Carolina law, a plaintiff demonstrates unjust enrichment by showing that 'it conferred a benefit on another party, that the other party consciously accepted the benefit, and that the benefit was not conferred gratuitously or by an interference in the affairs of the other party.'" *WJ Global LLC v. Farrell*, 941 F. Supp. 2d 688, 693 (E.D.N.C. 2013) (quoting *Se. Shelter Corp. v. BTU, Inc.*, 154 N.C. App. 321, 330, 572 S.E.2d 200, 206 (2002)).  "Where the only property at issue is subject to copyright, a claim for unjust enrichment under North Carolina law is preempted by

---

also true, however, that at this preliminary, motion to dismiss stage of the proceedings, our "[l]iberal pleading rules permit pleading in the alternative." *Catoe v. Helms Constr. & Concrete Co.*, 91 N.C. App. 492, 498, 372 S.E.2d 331, 335 (1988) (citing *Hall v. Mabe*, 77 N.C. App. 758, 760, 336 S.E. 2d 427, 429 (1985)).  Thus, although Plaintiff will not ultimately be able to recover under both an express and implied contract theory, Plaintiff is not foreclosed from properly pleading these claims in the alternative in its Complaint.

[5] The Court notes that although Defendant challenges Plaintiff's "malicious breach of contract" claim on preemption grounds, it would appear that this claim is more properly dismissed under Rule 12(b)(6) on grounds that the claim is not recognized as an independent cause of action under North Carolina law.

the Copyright Act." *Id.* (citing *Pan-Am. Prods. & Holdings, LLC v. R.T.G. Furniture Corp.*, 825 F. Supp. 2d 664, 695 (M.D.N.C. 2011)). "A claim for unjust enrichment may not be preempted, however, if the plaintiff can show that 'material beyond copyright protection' formed the basis of the unjust enrichment." *Id.* (quoting *Microstrategy, Inc. v. Netsolve, Inc.*, 368 F. Supp. 2d 533, 537 (E.D. Va. 2005)).

{54}   Plaintiff's unjust enrichment claim appears, at first blush, to be preempted on grounds that the "property at issue" – Plaintiff's software – "is subject to copyright." *WJ Global LLC*, 941 F. Supp. 2d at 693.  Indeed, Plaintiff's unjust enrichment claim derives from Defendant's conduct in connection with Plaintiff's intellectual property, which, as previously stated, is protectable under the Copyright Act.  17 U.S.C. §§ 102—103, 106; *see LogicBit*, 2012 NCBC 53 at ¶ 38.  The relevant case law reveals, however, that proper analysis of this issue requires more than a cursory glance at whether the subject matter involved is protectable under the Copyright Act.

{55}   For instance, in *Nat'l Car Rental Sys. v. Computer Assocs. Int'l*, 991 F.2d 426 (8th Cir. 1993), the plaintiff brought an unjust enrichment claim arising out of an alleged breach of a software licensing agreement.  In examining whether the claim was preempted by the Copyright Act, the court stated as follows:

> Finally, National claims that [plaintiff's] requested relief demonstrates its cause of action is equivalent to the exclusive rights under copyright. First, National notes that [plaintiff] requested damages for unjust enrichment, damages National claims are preempted under § 301. National is correct in noting that certain courts have held claims for unjust enrichment preempted when based upon allegations that the defendant engaged in one of the acts reserved to the copyright holder under § 106. We do not read [plaintiff] to allege that National was

unjustly enriched as a result of a wrongful exercise of one of the § 106 rights. Rather, we read this allegation of damage as a further explanation of the damages [plaintiff] intends to prove arising from the breach of contract. [Plaintiff] alleges generally that it has been damaged in an amount to be proved at trial, and it will have to prove those damages. In this context, we read its allegations of unjust enrichment as an attempt, albeit inartful, to allege that National received from Lend Lease and Tilden amounts that [plaintiff] would have received had National not breached their contract.

*Id.* at 434—35.

{56} Moreover, courts that have found unjust enrichment claims preempted by the Copyright Act have generally done so under circumstances in which the alleged conduct reveals a generic copyright infringement claim – that is, a claim that the defendant has copied or used the plaintiff's product without the proper authorization. *See, e.g., WJ Global LLC*, 941 F. Supp. 2d at 693 (finding preemption where "plaintiffs' claim for unjust enrichment stem[med] only from the claim that [defendant] improperly acquired copies of LookingGlass software as well as other intellectual property" and the "gist" of plaintiffs' claim was that defendant "violated plaintiffs' exclusive right to reproduce, distribute, and display LookingGlass software").

{57} Furthermore, some courts have determined that an unjust enrichment claim is not preempted where the plaintiff has raised a breach of contract claim that is not preempted. *See, e.g., Forest2Market, Inc.*, 2008 U.S. Dist. LEXIS 33185 at *16—*17 (concluding that where a "state law claim for breach of contract remains viable, it is unnecessary to address the claim for unjust enrichment at this point"); *Acorn Structures*, 846 F.2d at 927

(concluding that there was "no occasion to resolve [whether unjust enrichment claim was preempted] because at best [unjust enrichment] is only an alternative ground of action to that breach of contract which we have sustained").

{58} Here, Plaintiff alleges that Defendant saved significant time and money through development of its own software to replace Sparrow Systems and that Defendant was able to achieve this cost savings through deceitful conduct, including, *inter alia*, reverse engineering Plaintiff's software in contravention of the Contract. Plaintiff alleges in essence that, but for Defendant's wrongful conduct, Defendant would still be paying Plaintiff to use Sparrow Systems and that, accordingly, it is unjust to allow Defendant to retain the economic benefit flowing from its wrongful conduct. The Court finds that these allegations assert more than rights that are protected under the Copyright Act. Further, the Court notes that in advancing this claim, Plaintiff does not seek to recover damages for Defendant's unauthorized use of Plaintiff's software, but instead seeks to disgorge Defendant of benefits derived through reverse engineering and other alleged deceitful conduct that does not entail the mere copying of Plaintiff's software. The Court thus concludes that Plaintiff's unjust enrichment claim extends beyond the scope of the Copyright Act and is not subject to dismissal on preemption grounds.

v. Unfair and Deceptive Trade Practices

{59} Plaintiff predicates its unfair and deceptive trade practices ("UDTP") claim not only on Defendant's alleged appropriation of Sparrow Systems, but also on Defendant's alleged misrepresentations and deceitful conduct employed to conceal

the alleged appropriation. Plaintiff alleges, for instance, that Dr. Richardson intentionally deterred its investigation into Defendant's use of Sparrow Systems through false assurances that Defendant would adhere to its promises under the Contract. Plaintiff further alleges that Defendant removed "copyright notices and proprietary marks from [Plaintiff's] forms . . . to use them without paying [Plaintiff] and without putting others on notice that it was using Sparrow [Systems]." (Compl. ¶ 91.) These allegations describe conduct that extends beyond a mere copyright violation and will require proof of "extra elements" such as misrepresentation and deceitful conduct. Accordingly, the Court concludes that Plaintiff's UDTP claim is not preempted by the Copyright Act. *See, e.g.*, *Pan-Am Products*, 825 F. Supp. 2d at 698 (holding that plaintiff's UDTP claim under N.C.G.S. § 75-1.1, where defendant obtained plaintiff's design through intentional misrepresentations, was not preempted because "the fraud and not the actual copyright violation would be the gravamen of the claim"); *Innovative Medical Products, Inc., v. Felmet*, 472 F. Supp. 2d 678, 683 (M.D.N.C. 2006) (plaintiff's UDTP claim not preempted where "the complaint allege[d] more than the mere act of copying; it assert[ed] misrepresentations made by Defendants equivalent to palming or passing off their products as those of Plaintiff").

<u>Statute of Limitations</u>

{60} Defendant contends that Plaintiff's claims for breach of contract, unfair and deceptive trade practices, fraud, and unjust enrichment or quantum meruit are time-barred and therefore subject to dismissal pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure.

{61} "A motion to dismiss under Rule 12(b)(6) is an appropriate method of determining whether the statutes of limitation bar plaintiff's claim if the bar is disclosed in the complaint." *Carlisle v. Keith*, 169 N.C. App. 674, 681, 614 S.E.2d 542, 547 (2005). "Once a defendant raises a statute of limitations defense, the burden of showing that the action was instituted within the prescribed period is on the plaintiff." *Horton v. Carolina Medicorp*, 344 N.C. 133, 136, 472 S.E.2d 778, 780 (1996)). "A plaintiff sustains this burden by showing that the relevant statute of limitations has not expired." *Id.*

{62} For purposes of determining whether the claims in question are time-barred, the Court views the allegations in Plaintiff's Complaint in the light most favorable to Plaintiff. *Brooks v. Ervin Constr. Co.*, 253 N.C. 214, 219, 116 S.E.2d 454, 459 (1960) (accepting plaintiffs' evidence "as true and considering it in the light most favorable to them" in examining defendant's motion to dismiss).

### i. Breach of Contract

{63} As discussed above, Plaintiff alleges that Defendant breached the Contract multiple times, in multiple ways. Defendant now moves to dismiss two of the alleged breaches on grounds that they are time-barred under N.C.G.S. § 1-52(1), which sets forth a three-year statute of limitations for an action "[u]pon a contract . . . express or implied." Specifically, Defendant contests as untimely (i) any claim arising out of Plaintiff's disclosure of its intellectual property to Dr. Sun and Urology in 2004, as such claim has been time-barred since 2007; and (ii) any claim arising out of Plaintiff's disclosure of its data dictionary to Dr. Richardson in 2008, as such claim

has been time-barred since 2011.[6]

{64} "In general, an action for breach of contract must be brought within three years from the time of the accrual of the cause of action." *Penley v. Penley*, 314 N.C. 1, 119—20, 332 S.E.2d 51, 62 (1985) (citing N.C.G.S. § 1-52(1)). The three-year statute of limitations "begins to run on the date the promise is broken," *id.* at 20, 332 S.E.2d at 62, irrespective of whether "the harmful consequences of the breach . . . were not discovered or discoverable at the time the cause of action accrued," *Brantley v. Dunstan*, 10 N.C. App. 706, 708—09, 179 S.E.2d 878, 880 (1971).

{65} Plaintiff acknowledges the three-year statute of limitations, but contends that the doctrine of equitable estoppel applies to preclude Defendant from raising the statute of limitations as a defense under the present circumstances.

{66} Equitable estoppel "arises when an individual by his acts, representations, admissions, or by his silence when he has a duty to speak, intentionally or through culpable negligence induces another to believe that certain facts exist, and such other person rightfully relies and acts upon that belief to his detriment." *Thompson v. Soles*, 299 N.C. 484, 487, 263 S.E.2d 599, 602 (1980). "In order for equitable estoppel to bar application of the statute of limitations, a plaintiff must have been induced to delay filing of the action by the misrepresentations of the defendant." *Jordan v. Crew*, 125 N.C. App. 712, 720, 482 S.E.2d 735, 739 (1997).

{67} In *Hawkins v. Finance Corp.*, 238 N.C. 174, 77 S.E.2d 669 (1953), our Supreme Court described the doctrine of equitable estoppel as follows:

---

[6] Defendant does not specifically contend that any of the other alleged breaches of the Contract are time-barred. Accordingly, the Court will not address them here.

[T]he essential elements of an equitable estoppel as related to the party estopped are: (1) Conduct which amounts to a false representation or concealment of material facts, or, at least, which is reasonably calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party afterwards attempts to assert; (2) intention or expectation that such conduct shall be acted upon by the other party, or conduct which at least is calculated to induce a reasonably prudent person to believe such conduct was intended or expected to be relied and acted upon; (3) knowledge, actual or constructive, of the real facts. As related to the party claiming the estoppel, they are: (1) lack of knowledge and the means of knowledge of the truth as to the facts in question; (2) reliance upon the conduct of the party sought to be estopped; and (3) action based thereon of such a character as to change his position prejudicially.

*Id.* at 177—78, 77 S.E.2d at 672.

{68} Plaintiff alleges here that Defendant concealed its breaches of the Contract through false assurances that it would not reverse engineer or adapt Plaintiff's software. Plaintiff further alleges that it relied on these assurances and that such reliance was reasonable in light of the source of the assurances (Dr. Richardson) and in light of Defendant's promises under the Contract. Finally, Plaintiff alleges that its reasonable reliance on Defendant's assurances caused it to refrain from a more rigorous investigation of the suspected breaches and that, as a result, Plaintiff was unable to discover the alleged breaches until 2012. Plaintiff's allegations suggest that because Plaintiff was limited in its ability to observe Defendant's performance under the Contract, Plaintiff was required to rely, at least to a certain extent, on Defendant accurately and honestly reporting its continued adherence to the Contract. The Court finds that Plaintiff's allegations are sufficient to raise a reasonable inference that each of the elements of equitable estoppel is present, *Grindstaff v. Byers*, 152 N.C. App. 288, 293, 567 S.E.2d 429, 432 (2002) (providing that "[i]n ruling on a motion to

dismiss . . . every reasonable inference must be drawn in favor of plaintiff."), and, therefore, that the alleged breaches of the Contract at issue are not subject to dismissal on statute of limitations grounds at this stage of the proceedings.

## ii. Unfair and Deceptive Trade Practices

{69}   Defendant contends that Plaintiff's UDTP claims are time-barred to the extent they are based upon (i) Dr. Richardson's assurances that Urology would not misappropriate Plaintiff's intellectual property after Plaintiff installed Sparrow Systems on Dr. Sun's computer in 2004; and (ii) Dr. Richardson's threat to terminate Defendant's relationship with Plaintiff if Plaintiff refused to divulge its data dictionary to Defendant for quality control testing in 2008.  Defendant asserts that through exercise of reasonable diligence Plaintiff could have discovered the conduct in connection with these incidents of which Plaintiff now complains, but instead "chose to stick its head in the sand" for fear of "rocking the boat" with its largest client.  (Def.'s Br. Supp. Mot. to Dismiss, p. 16.)

{70}   In North Carolina, a UDTP claim must be brought "within four years after the cause of action accrues."  N.C.G.S. § 75-16.2 (2014).  Where the UDTP claim is based on fraud, the action is deemed to accrue "at the time the fraud is discovered or *should have been discovered* with the exercise of reasonable diligence."  *Nash v. Motorola Commc'ns & Electronics, Inc.*, 96 N.C. App. 329, 331, 385 S.E.2d 537, 538 (1989) (emphasis in original).

{71}   Plaintiff concedes that some of the conduct underlying its UDTP claim transpired more than four years prior to its initiation of this action.  Plaintiff insists, however, that Plaintiff could not have discovered this conduct through exercise of

reasonable diligence earlier than 2012, due in large part to Defendant's concealment of its actions, for example, through Dr. Richardson's representations to Ms. Clontz that Defendant was cognizant of and would not breach the Contract. Plaintiff thus contends that it was well within the four-year statute of limitations when it filed this action, including its UDTP claim, on January 16, 2014.

{72} While it is true, as Defendant points out, that the question of reasonable diligence "may be determined as a matter of law where the plaintiff clearly had both capacity and opportunity to discover" the conduct in question, *Wysong & Miles Co. v. Employers of Wausau*, 4 F. Supp. 2d 421, 433 (M.D.N.C. 1998), Plaintiff's allegations here do not permit a reasonable inference that Plaintiff *clearly* had the opportunity to discover the conduct underlying its UDTP claims prior to 2012, when Plaintiff discovered that a Duke employee had been assigned to "learn" Sparrow Systems and that Defendant was in the process of developing software to replace Sparrow Systems.

{73} Indeed, Plaintiff's allegations invite varying and conflicting inferences with respect to whether Plaintiff exercised reasonable diligence in its discovery of the conduct in question. Plaintiff alleges, for instance, that Ms. Clontz investigated possible breaches of the Contract and voiced her concerns to Defendant's physicians; but Plaintiff also admits that it did not press its investigation following Dr. Richardson's assurances, even when suspicions lingered, for fear of jeopardizing its relationship with Defendant.

{74} In light of these allegations, the Court cannot conclude, as Defendant urges, that Plaintiff failed to exercise reasonable diligence in pursuing its suspicions as a

matter of law. Accordingly, the Court declines to conclude that Plaintiff's UDTP claim is time-barred at this stage of the proceedings.

### iii. Fraud

{75} Defendant contends that Plaintiff's fraud claim should be time-barred for the same reasons advanced above in support of its contention that Plaintiff's UDTP claim should be time-barred. Similar to the statute of limitations for a UDTP claim, however, the statute of limitations for a fraud claim "begins to run from the discovery of the fraud or from the time it should have been discovered in the exercise of reasonable diligence." *Calhoun v. Calhoun*, 18 N.C. App. 429, 432, 197 S.E.2d 83, 85 (1973) (citations omitted); N.C.G.S. § 1-52(9) (2014). Accordingly, because the Court cannot find, based on the allegations in Plaintiff's Complaint, that Plaintiff reasonably should have discovered the conduct in question more than three years prior to filing this action, the Court declines to conclude, at this stage of the proceedings, that Plaintiff's fraud claim is time-barred.[7]

### iv. Unjust Enrichment

{76} Defendant contends that Plaintiff's claim for unjust enrichment is barred by the doctrine of laches, asserting, again, that Plaintiff could have discovered the conduct in question many years ago through exercise of reasonable diligence.

{77} "Laches is an equitable doctrine 'designed to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until

---

[7] The fact that the statute of limitations for a fraud claim is three years, N.C.G.S. § 1-52(9), whereas the statute of limitations for a UDTP claim is four years, N.C.G.S. § 75-16.2, is of no consequence on the facts presented, because Plaintiff alleges that it discovered the conduct at issue in 2012, and, accepting these allegations as true, Plaintiff filed its fraud claim within the shorter, three-year statute of limitations under N.C.G.S. § 1-52(9).

evidence has been lost, memories have faded, and witnesses have disappeared.'"

*Stratton v. Royal Bank of Can.*, 211 N.C. App. 78, 88—89, 712 S.E.2d 221, 230 (2011) (citation omitted).

> To establish the affirmative defense of laches, our case law recognizes that 1) the doctrine applies where a delay of time has resulted in some change in the condition of the property or in the relations of the parties; 2) the delay necessary to constitute laches depends upon the facts and circumstances of each case; however, the mere passage of time is insufficient to support a finding of laches; 3) the delay must be shown to be unreasonable and must have worked to the disadvantage, injury or prejudice of the person seeking to invoke the doctrine of laches; and 4) the defense of laches will only work as a bar when the claimant knew of the existence of the grounds for the claim.

*Id.* at 89, 712 S.E.2d at 231.

{78} Defendant's laches defense is similar to its defense that Plaintiff's breach of contract, UDTP, and fraud claims should be time-barred, even in the absence of the statute of limitations, because Plaintiff made the conscious decision to avoid "rocking the boat" instead of diligently investigating its suspicions at the time Defendant's alleged breaches occurred.

{79} In light of Plaintiff's allegations and for the reasons stated above in connection with Plaintiff's UDTP and fraud claims, the Court cannot conclude at this time that Plaintiff's delay in filing suit until 2014 was unreasonable as a matter of law. Accordingly, the Court declines to conclude that Plaintiff's unjust enrichment claim is time-barred at this stage of the proceedings.

<u>Legal Sufficiency of Plaintiff's Claims</u>

{80} Defendant further contends that Plaintiff's claims for breach of contract, malicious breach of contract, UDTP, fraud, and breach of the covenant of good faith

and fair dealing should be dismissed pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted. Applying the Rule 12(b)(6) standard articulated above, the Court will examine the legal sufficiency of each of the contested claims, in turn, below.

### i. Breach of Contract

{81} Defendant contends that Plaintiff has failed to state a claim for breach of contract because there was never a valid contract in place to govern the parties' relationship. Defendant advances two arguments in support of its position on this issue, both of which are variations on Defendant's overarching contention that it never agreed to be bound by the terms of the Contract.

### Meeting of the Minds

{82} Defendant first argues that there was never a "meeting of the minds" with respect to the terms of the Contract, as evidenced by the email correspondence between Ms. Clontz and Defendant's technology employee, Mr. Perun.

{83} "It is a well-settled principle of contract law that a valid contract exists only where there has been a meeting of the minds as to all essential terms of the agreement." *Miller v. Rose*, 138 N.C. App. 582, 587, 532 S.E.2d 228, 232 (2000) (citation and quotation marks omitted). "[T]he parties must assent to the same thing in the same sense, and their minds must meet as to all the terms." *Boyce v. McMahan*, 285 N.C. 730, 734, 208 S.E.2d 692, 695 (1974) (citation and quotation marks omitted).

{84} Defendant's submissions[8] to the Court reveal that Mr. Perun transmitted the Contract to Ms. Clontz via email on August 15, 2002. In his email, Mr. Perun states that the Contract had been "updated by Duke legal"; that Ms. Clontz should make the "necessary changes" and return the Contract to him; and that he would touch base with another Duke employee to "see what the next step is from his perspective." (Def.'s Mot. to Dismiss, Ex. A.) Ms. Clontz responded later that day, indicating that she had "accepted the revisions" and requesting that Mr. Perun "let [her] know what [the] next steps are in terms of finalizing [the Contract]." (*Id.*) The Court finds, notwithstanding the foregoing correspondence between Ms. Clontz and Mr. Perun, that Plaintiff's allegations, including those concerning the parties' continued performance for roughly a decade in accordance with the terms of the Contract, when viewed in the light most favorable to Plaintiff, suffices to create a reasonable inference that the parties mutually agreed to be bound by the terms of the Contract.

### Mr. Perun's Authority

{85} Defendant additionally contends that no valid contract existed between the parties because Mr. Perun lacked the proper authority to bind Defendant to the Contract.

---

[8] "[W]hen ruling on a Rule 12(b)(6) motion, a court may properly consider documents which are the subject of a plaintiff's complaint and to which the complaint specifically refers even though they are presented by the defendant." *Oberlin Capital, L.P. v. Slavin*, 147 N.C. App. 52, 60, 554 S.E.2d 840, 847 (2001). Here, Defendant has submitted email correspondence between Ms. Clontz and Mr. Perun as Exhibit A to its Motion to Dismiss. Plaintiff's Complaint specifically describes and quotes from this correspondence. (Compl. ¶¶ 22—23.) Accordingly, the Court may properly consider Defendant's submissions without converting Defendant's Motion to Dismiss to a motion for summary judgment.

{86}  A principal will be held liable on "a contract made by its agent with a third party in three instances: when the agent acts within the scope of his or her actual authority; when a contract, although unauthorized, has been ratified; or when the agent acts within the scope of his or her apparent authority." *Bell Atl. Tricon Leasing Corp. v. DRR, Inc.*, 114 N.C. App. 771, 774, 443 S.E.2d 374, 376 (1994).

{87}  "'Apparent authority includes authority to do whatever is usual or necessary to transact the business an agent is employed to transact'" and is determined by the unique facts of each case." *Institution Food House, Inc. v. Circus Hall of Cream, Inc.*, 107 N.C. App. 552, 556, 421 S.E.2d 370, 373 (1992) (citation omitted).

{88}  Plaintiff alleges that Mr. Perun was the Duke employee assigned to implement Sparrow Systems for Defendant and that Mr. Perun was the designated point of contact at Duke with whom Ms. Clontz corresponded concerning finalization of the Contract.  Although the correspondence between Ms. Clontz and Mr. Perun may call into question the existence of an express contract between Plaintiff and Defendant, this would be merely one permissible inference to draw based upon the submissions of record, and the Court is cognizant that it must, at this stage of the proceedings, view the allegations in Plaintiff's Complaint in the light most favorable to Plaintiff.  *Block*, 141 N.C. App. at 277–78, 540 S.E.2d at 419.

{89}  Moreover, and aside from the question of Mr. Perun's authority, Plaintiff's allegations permit a reasonable inference that Defendant ratified the Contract through its own conduct in the years following the correspondence between Ms. Clontz and Mr. Perun. *See, e.g.*, *Jones v. Bank of Chapel Hill*, 214 N.C. 794, 797, 1

S.E.2d 135, 136 (1938) (concluding that defendant through its conduct and knowledge of contract's terms ratified its contract with plaintiff).

{90} Accordingly, the Court declines, at this stage of the proceedings, to dismiss Plaintiff's breach of contract claim on grounds that there was no meeting of the minds between the parties with respect to the terms of the Contract or that no valid contract existed because Mr. Perun lacked authority to bind Defendant to the Contract.

## ii. Unfair and Deceptive Trade Practices

{91} Defendant contends that Plaintiff has failed to state a claim for unfair and deceptive trade practices because "[a]ll of the facts that [Plaintiff] alleges in support of its claim for UDTP are nothing more than an attempt to convert a breach of contract claim into a claim for UDTP." (Def.'s Mot. to Dismiss, p. 19.)

{92} "To state a claim for unfair and/or deceptive trade practices, [Plaintiff] must allege that (1) [Defendant] committed an unfair or deceptive act or practice, or an unfair method of competition, (2) in or affecting commerce, (3) which proximately caused actual injury to [Plaintiff] or to [Plaintiff's] businesses." *Walker v. Sloan*, 137 N.C. App. 387, 395, 529 S.E.2d 236, 243 (2000). "A [trade] practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Id.* (citations and quotation marks omitted) (alteration in original).

{93} "[I]t is well recognized . . . that actions for unfair or deceptive trade practices are distinct from actions for breach of contract, and that a mere breach of contract, even if intentional, is not sufficiently unfair or deceptive to sustain an action under N.C.G.S. § 75-1.1.'" *Watson Elec. Constr. Co. v. Summit Cos., LLC*, 160 N.C. App.

647, 657, 587 S.E.2d 87, 95 (2003) (quoting *Eastover Ridge, L.L.C. v. Metric Constructors, Inc.*, 139 N.C. App. 360, 367—68, 533 S.E.2d 827, 832—33 (2000)) (alterations in original).

{94} Here, Plaintiff alleges not only that Defendant breached the Contract by reverse engineering Plaintiff's software, but also that Defendant engaged in deceitful conduct in order to effectuate and conceal its breaches. Plaintiff alleges, for example, that Defendant procured Plaintiff's proprietary information under the pretense of "quality control" testing in 2008 and 2012 and that Defendant threatened to cancel its contract with Plaintiff if Plaintiff refused to comply. Plaintiff further alleges that Dr. Richardson, in an attempt to quell Ms. Clontz's concerns and deter further investigation, falsely assured Ms. Clontz that Defendant would honor its promises under the Contract. Finally, Plaintiff alleges that Dr. Richardson cautioned Ms. Clontz against "rocking the boat" in light of Defendant's deep pockets and ability to "outlawyer" Plaintiff. The Court concludes that these allegations evince more than a mere claim for breach of contract and suffice, when viewed in the light most favorable to Plaintiff, to withstand Defendant's Motion to Dismiss.

### iii. Fraud

{95} Defendant contends that Plaintiff's allegations fail to state a claim for fraud as a matter of law, asserting that Plaintiff's fraud claim represents yet another attempt by Plaintiff to disguise a simple breach of contract claim as something more sinister.

{96} "[T]he essential elements of actionable fraud are: (1) false representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with

intent to deceive, (4) which does in fact deceive, and (5) resulting in damage to the injured party." *Harrold v. Dowd*, 149 N.C. App. 777, 782, 561 S.E.2d 914, 918 (2002) (citing *Ragsdale v. Kennedy*, 286 N.C. 130, 138, 209 S.E.2d 494, 500 (1974)). In addition, a claimant pleading actual fraud must allege with particularity the "time, place and content of the fraudulent representation, identify of the person making the representation and what was obtained as a result of the fraudulent act or representations." *Sharp v. Teague*, 113 N.C. App. 589, 597, 439 S.E.2d 792, 797 (1994).

{97} The Court concludes that Plaintiff's allegations are sufficient to state a claim for fraud for many of the same reasons cited above in the Court's examination of Plaintiff's UDTP claim. Specifically, Plaintiff alleges that Defendant intentionally deceived Plaintiff through, *inter alia*, Dr. Richardson's false assurances that Defendant would not attempt to reverse engineer Sparrow Systems and that Defendant intentionally deterred Ms. Clontz's investigation into its possible breaches of the Contract. Plaintiff further alleges that Defendant concealed its breaches of the Contract and continued to mislead Plaintiff for roughly a decade in order to permit Defendant the time and opportunity to develop a replacement for Sparrow Systems and that Defendant ultimately achieved its cost savings objective to the detriment of Plaintiff's business. The Court finds that these allegations describe more than "[m]ere generalities and conclusory allegations of fraud" and are sufficient to meet the heightened pleadings standards for a fraud claim under North Carolina law.

### iv. Good Faith and Fair Dealing

{98} "'In every contract there is an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to receive the benefits of the agreement.'" *Bicycle Transit Authority, Inc. v. Bell*, 314 N.C. 219, 228, 333 S.E.2d 299, 305 (1985) (citation omitted).

{99} Defendant advances little argument, and no authority, in support of its contention that Plaintiff's claim for breach of the covenant of good faith and fair dealing should be dismissed for failure to state a claim, asserting only that Plaintiff's allegations "do not rise to the level of bad faith efforts to frustrate [Plaintiff's] rights under a contract." (Def.'s Br. Supp. Mot. to Dismiss, p. 23.)

{100} Plaintiff alleges that a valid contract existed between the parties, giving rise to an implied covenant of good faith and fair dealing, and that Defendant breached this covenant "by engaging in . . . numerous acts . . . designed to misappropriate [Plaintiff's] intellectual property without just compensation, to cover up that a violation of the Contract had occurred, and to use [Defendant's] unequal bargaining power . . . to intimidate [Plaintiff] into ignoring [Defendant's] contract violations and unfair and deceptive acts." (Compl. ¶ 72.) The Court concludes that these allegations, which also incorporate by reference Plaintiff's allegations supporting its claim for unfair and deceptive trade practices, are sufficient, when viewed in the light most favorable to Plaintiff, to state a claim upon which relief can be granted.

### v. Punitive Damages

{101} Pursuant to N.C.G.S. § 1D-1[9], "punitive damages may be awarded 'to punish a defendant for egregiously wrongful acts and to deter the defendant and others from committing similar wrongful acts.'" *Springs v. City of Charlotte*, 730 S.E.2d 803, 805 (N.C. Ct. App. 2012) (quoting N.C.G.S. §1D-1). "To justify an award of punitive damages, the claimant must prove that the defendant is liable for compensatory damages and that an aggravating factor—either fraud, malice, or willful or wanton conduct—'was present and was related to the injury[.]'" *Id.* (quoting N.C.G.S. §1D-15(a)).

{102} Punitive damages are available for both a successful fraud claim and a successful UDTP claim. *See Jones v. Harrelson & Smith Contrs., LLC*, 194 N.C. App. 203, 217, 670 S.E.2d 242, 252 (2008) (explaining that a plaintiff "can assert both UDTP violations under N.C.[G.S.] § 75-1.1 and fraud based on the same conduct or transaction" and that "[s]uccessful plaintiffs may receive punitive damages or be awarded treble damages, but may not have both" (citation and quotation marks omitted)).

---

[9] Plaintiff's Complaint mistakenly captions its request for punitive damages as a claim pursuant to N.C.G.S. § 1*B*-1, instead of N.C.G.S. § 1D-1. (Compl., p. 30.) Because Defendant notes this error in its Motion to Dismiss, and because Plaintiff has confirmed in its response to Defendant's Motion to Dismiss that it seeks punitive damages pursuant to N.C.G.S. § 1D-1, the Court finds that no prejudice has been caused to Defendant as a result of the oversight. *See Pyco Supply Co. v. American Centennial Ins. Co.*, 321 N.C. 435, 444, 364 S.E.2d 380, 385 (1988) (providing that "the primary function of pleadings is to give sufficient notice of the events or transactions which produced the claim with sufficient precision to enable the adverse party to understand the nature and basis of [the claim] and [to] allow the opponent to prepare [a defense]").

{103} Defendant cites *Sharyn's Jewelers, LLC v. Ipayment, Inc.*, 196 N.C. App. 281, 287, 674 S.E.2d 732, 737 (2009), for the proposition that "punitive damages are not available even for a willful or malicious breach of contract[.]" Defendant omits, however, the latter portion of this quoted sentence, which clarifies that "where the breach also constitutes an independent tort, punitive damages may be available." *Id.*; *see also Newton v. Standard Fire Ins. Co.*, 291 N.C. 105, 111, 229 S.E.2d 297, 301 (1976) (providing that "where there is an identifiable tort even though the tort also constitutes, or accompanies, a breach of contract, the tort itself may give rise to a claim for punitive damages").

{104} Accordingly, because Plaintiff here has sufficiently alleged both a claim for fraud and a claim for UDTP in the present case, Plaintiff's punitive damages is not subject to dismissal for failure to state a claim upon which relief can be granted.

B.

Defendant's Motion for Attorneys' Fees

{105} Defendant also moves the Court for an award of "all costs expended in defending this lawsuit," including "attorneys' fees expended in defending Chapter 75 claims[.]" (Def.'s Mot. to Dismiss, p. 2.) In light of the Court's resolution of Defendant's Motion to Dismiss, however, the Court finds no valid basis for an award of attorneys' fees or costs at this time.

III.

CONCLUSION

{106} For the foregoing reasons, the Court hereby **GRANTS** in part and **DENIES** in part Defendant's Motion to Dismiss and **DENIES** Defendant's Motion for Attorneys' Fees.


**SO ORDERED**, this the 24th day of December, 2014.